Your Honor, may it please the Court, my name is Jeffrey Dickerson, appearing on behalf of the appellant, Rich Deneu. This case arises out of the state of Nevada, the district court below, granted summary judgment in favor of the defendants. We're asking this court to reverse that. Judge McKibben was a district court judge, and I believe that his decision based upon his view of the December 2003 meeting was factually in error. And I'm not sure why Judge McKibben overlooked the fact that in that meeting, Mr. Deneu brought up concerns about discrimination in a hostile environment based upon age. In fact, in his complaint to Affirmative Action a couple of months later, he said that during that meeting, I told him that I felt that I was in a hostile work environment, that there was sexual discrimination going on against me, since I was the only male employee of Tipton, that I felt my age was a factor, and I felt that he was trying to get me to quit. So Judge McKibben didn't even mention that, and that's clearly in the record in several places. And that is the springboard of protected activity from which our retaliation claim arises. Counsel, my difficulty with your case, just speaking only for myself, is that it appears that the employer had a legitimate non-discriminatory reason, non-retaliatory reason for each of the actions it took for reassigning duties and so forth, based on your client's less than satisfactory performance. And that does not appear to be rebutted. What is your response to that? What's the showing of pretext? Thank you, Judge Griebel. The showing of pretext on that is several-fold, if I may. First of all, we have a differential of a huge amount of years of experience in law enforcement by Mr. Deneu, with the other comparator being a bouncer in nightclubs for a few years, working in excavation and other types of things. At the time, he was working in a glass shop and wasn't even working full-time in security. Mr. Deneu had been at this job since 1999 for several years and had the experience. He testified that he had not been told that he had any performance problems in the security area. So either they were keeping it a secret from him or they were making this up. I think it's a jury question. Additionally, Your Honor, that he had meet standards performance reviews every year. If there was a problem with his work on the security end of things, that should have been pointed out. And although they said that there were staff complaints about him, there was no staff complaint presented to him in writing.  They're saying that you guys are complaining about me. Mr. Deneu's testimony is that his supervisors below him and the subordinates below that said, no, there's no problem. We're getting along fine. So I think that those things create an issue of pretext. In addition, Your Honor, if you go to the actual reassignment of duties itself, when it occurred in that particular meeting, it was a sudden thing. There had been no prior discussion with Mr. Deneu about removing the security duties from him. Kind of unusual. The other thing, unusual, not unusual in this time context because now we're in the retaliation context, but prior to December of 2003, there were weekly meetings, and this probably would have been discussed with him if there were not a retaliatory environment. The other thing is that he asked why the security was being reassigned, and Mr. Kerr could not give him a reason and did not give him a reason. And now they make up a reason after the fact in order to legitimize it. I hope that answers your question, Your Honor. Springing from the December of 2003 protected activity, we move forward into the fact that his weekly meetings with his direct supervisor, Tipton, suddenly stopped. They'd been having weekly meetings for about a year. They were still meeting. They just weren't having regular meetings. Well, there's two different kinds of meetings, and I'm sure you're aware of this because you always review the record, Your Honor. But there are two different meetings, just to point out for the other judges. There's the weekly meetings with Tipton, his direct supervisor, and then there's the organizational meetings with the staff, two different types of things. There was confusion in the record about the organizational meetings and when that stopped. In reviewing for oral argument, it's my conclusion that that had stopped long ago. He had quit going to the organizational meetings. So that's not an adverse action that we're contending at oral argument here. But with respect to the weekly meetings with Tipton, I think that the testimony of Mr. Deneu is that those had been ongoing through 2003 and into early 2004 and that they stopped, and they stopped before he went to affirmative action. And there's never another meeting? Well, I think that they met, but his testimony is after he went to affirmative action, the best he would get from Mr. Tipton was a grunt in the hallway, and when he asked him a question, he'd get no answer. That's the testimony, Your Honor. So we've got two different protected activities, too. I mean, we've got a sequencing here going on that kind of confuses the issue, but I think for a jury it creates an exacerbating type of circumstance, and it relates back to the December. And what I'm talking about is the second protected activity being going to affirmative action. Right, in 2004, right. Back to the December 2003 meeting, the testimony is that when he said what I just said about being discriminated against, the response of Kerr was, you're being paranoid, and have you taken this to affirmative action? Do you intend to take this to affirmative action? So there's some evidence that a reasonable jury could pick on to say, this guy was concerned about this guy going to affirmative action. But if you look at the December 2000 meeting, then the basic adverse employment action you're alleging in connection with that didn't occur until August. Is that right? No. The transfer of the security duties happened in February. February, okay. February 26th was when he was deposited. So that was the transfer of duties. Well, you know, the Coast Salter v. City of Salem, Ray v. Henderson, Yartsov v. Thomas, those are a trilogy of cases that we cited in our briefing that you can look at, where I believe that you can conclude in and of itself was reasonably likely to deter protected activity, and certainly for this particular plaintiff. And you know that that is a case-by-case analysis. And in this particular case, Mr. Deneu explained in some depth how that affected him. Security was a great part of his job, and he had done it correctly in his view, and he liked that part of the job, and it was taken away from him, demeaning his work performance and belittling, if you will, his future as the employer, because this put a stigma to him or upon him that he no longer could perform these duties. What's your best evidence to show retaliatory intent? We have three different things, Your Honor. As you know from the Ulrich v. City and County of San Francisco case and others, this circuit has recognized three ways to show causation or motivating factor by circumstantial evidence. One is opposition to the activity. The other is simple proximity between the protected activity and the adverse result, and the other is pretext for the reason given for the adverse action. In this case, we have direct statements that I think a reasonable juror could lock onto. It's not direct evidence in the sense of Godwin in terms of not requiring an inference or a presumption, but putting it all together, here's what I have. In the meeting on December of 2003, he tells them he's paranoid. Now, just because somebody says you're paranoid doesn't mean they're not really out to get you. He says, are you going to affirmative action, which indicates something's on his mind about that. A juror could infer from that guilty knowledge. There's no, what are we going to do about this? Presumably he's a trained employer in the sexual harassment policy that they put before you in the record that says, if you learn of a complaint of discrimination, an employer has an obligation not only to report it to the proper place, but to get it investigated and to have it remedied. That's been the law in this case since Ellison v. Brady. And there was no investigation and no remedy in response. Then we have the transfer of duties. And an additional fact here with respect to opposition and with respect to the other things that we've just discussed about that particular activity is the fact that he had Plan B. He'd gone to Bodge, a substantially younger employee who had not reported discrimination. This is Kerr. He went to her and said, I think when I do the transfer of the security duties, it might cause Rich to resign. Would you take over his duties? So that's a reasonable juror from that could conclude that his intent in transferring the duties was to create such a hostile environment, such an adverse impact upon the plaintiff, that it would cause him to get out of there. Then in July of 2004, we have the memo that's in the record from Kerr to the affirmative action officer saying, I'm thinking of moving the ushering duties. Now, this is after the affirmative action thing is put to bed. So now he thinks he's safe. He writes to the affirmative action officer and says, I want to kill him altogether. I want to take all the ushering duties off. Is that what it said in the memo? I want to kill him altogether? It does not say that. I was using argument. There's another explanation. They've had a lot of complaints about him in the ushering area. Well, that's true. But this, I think the issue for a juror is, why didn't he confront the plaintiff about this? And why is he writing the affirmative action officer about this particular matter when the affirmative action thing is closed? So I think there's an issue about that. But it shows an intent, an ongoing intent. First, with respect to the transfer of duties of security, he has plan B because he thinks he might want to kill him or he might resign. That doesn't happen. And then in July, behind Mr. Deneu's back, he's thinking of reassigning the ushering duties, the remaining duties, if you will, without telling Deneu and indicating that he would put him on, keep him on the payroll for a year and a half until he retired. I think all of that evidence, my time's up, I think all of that evidence warrants reversal in this case, Your Honor. This is a genuine issue of material fact. Thank you. Thank you, counsel. Good morning. Mary Dugan on behalf of defendants Joe Kerr and John Tipton. I think you've hit upon an important issue in this case, and that is that the context of the December 2003 conversation followed written memorandum between the plaintiff and his supervisor, Joe Kerr. When the plaintiff learned that there was a possibility of a contract being let for security, he was concerned about it because security had been part of his responsibilities. And so he wrote a memo to his supervisor, Joe Kerr, and he asked him very specific questions. Excuse me. In the record on page 222, he asked him, when would this contract take effect? How do you envision my position being involved with this contract? How do you envision my position at the university in Lawler Events Center? What will the effect of this contract be on guest services? His memo was completely about what is the effect of this contract, and that was on December 17, 2003. On the very next day, Joe Kerr and his supervisor wrote back to him a lengthy memo explaining the situation about the contract that the university was letting. And contrary to plaintiff's representations, he did explain why this contract was being let. It had been let already and was actually already in effect, but now the effort was to extend it even longer. And he wrote on the very first page of the explanation in response to his questions, when intercollegiate athletics wished to increase the level of security at their football games, they didn't have confidence in you or the Lawler Events staff to meet their needs. And he goes on in that paragraph to identify several incidents where there had been security issues, including a Fleetwood Mac concert that had gotten completely out of control and had to be stopped because of security issues. So the plaintiff knew why the security contract might be let. And at the end of his, and on the second page, Mr. Kerr specifically answered each of the questions. And in number three, he said, there is no change in your position with the awarding or extension of this contract. His hours weren't going to be changed. This was just going to be able to provide additional security when it was needed. And in the very last paragraph of the memo, he states, please do not hesitate to let me know if there is any other information I can provide. I am sincere in my encouragement of developing a competent in-house staff capable of performing higher risk security functions. And he spends a rather lengthy paragraph encouraging him to do more training on security, to use in-house staff so that although this outside contract might be let by the university, which Joe Kerr couldn't control, they could still use in-house staff as much as possible. And he encouraged him to increase the security program. More evidence that he didn't have an intent to take all the security duties out from under him or retaliate against him in any way. Counsel also indicated that there had not been any warning to plaintiffs before there was a change in security that that might happen. However, the record shows at page 231 that there had been an instance in the prior evaluation of plaintiff's conduct being rated as not meeting standard in connection with security issues. So he did tell him why there was maybe going to be an outside security contract. In the end, that contract wasn't let. And so the need for more in-house security became even greater. Plaintiff and Mr. Kerr had the conversation in December of 2003. At that time, plaintiff was encouraged to do more security development. Mr. Kerr didn't see any progress happening in that regard. He was concerned about security issues that still were left over from before, concerns by the other clients, if you will, of Lawler Event Center. And so in February, because he hadn't seen any progress, he did change the security functions. And there were legitimate reasons for this. The director of the university police services had complained. This is in the record at page 231. The associate director of university police services had complained. A university police officer had expressed concerns. Touring event show producers complained of a lack of responsiveness of the Lawler security staff. The Washoe County School District, which is the local school district, their police refused to work with the plaintiff because of his unprofessional behavior. As I've already mentioned, the university athletic department lacked confidence in his abilities to meet their needs. The previous year, the evaluation had indicated his performance did not meet standards. And I've already mentioned the Fleetwood Mac contract or concert. In addition, the plaintiff himself had said that he had been trained to take people down by the hair and not use verbal judo, and that's in the record at page 380. So because there had been complaints about plaintiff's performance by these clients of Lawler Event Center, and because Mr. Kerr had talked to the plaintiff about the need to increase security training and the ability for in-house staff to respond, and because the plaintiff had not responded by increasing staff training, Mr. Kerr was left with the decision to change the makeup of the staff and give the security duties to another individual, which he did. Now, with respect to the fact that plaintiff did mention at the end of this conversation in December, which followed the two back-and-forth memos regarding the security issues and the security contract, plaintiff did mention that he thought that this university letting of this contract was based on hostile work environment, age discrimination, veteran status, and gender discrimination. But he was talking about himself. He was talking about his own personal employee situation. And it is our position that this did not constitute protected speech. But what do you do with the situation where the district judge got it wrong? I'm sorry? That the district judge got it wrong. He was unaware of this conversation that's in paragraph 3, exerted record 281. The reason that he, I believe the reason he didn't mention this conversation in his order was because it wasn't pled. If you look at the plaintiff's complaint, his complaint is very specific about the actions that constituted protected speech and the actions that constituted alleged retaliatory action. They're very specific. There's dates and everything. And this issue of this December conversation didn't come up until plaintiff had to oppose the defendant's motion for summary judgment. And I think what happened then is when the defendants pointed out that, look, you've got the cart before the horse. You've got the alleged adverse action happening before the alleged protected speech. The plaintiff had to come up with another theory. And he did that. Wasn't it alleged in his complaint? There was not a mention of the conversation in the complaint. And, in fact, when he moved to amend his complaint to add a 1983 action, he didn't include it there either. So he had an opportunity when he was amending his complaint or when he was seeking leave to amend his complaint to include this as a new or as a specific instance of protected speech, and he didn't do so. And I believe that's because he didn't think of it, frankly, until he saw that he needed to have a different protected speech to save his claim from summary judgment. I'm confused about that. I'm looking at the original complaint, page 1, paragraph 3, and he lists a number of activities which constitute protected activity under the First Amendment. And about in the middle of that paragraph lines, it's kind of below 23 and 24, he says, Complaining to defendants regarding hostile working environment, age discrimination, and sex discrimination. Now, there's no date attached to that, but it comes right after something else that happened in December of 2003. Do you not take that to be a reference to this same conversation that we've been discussing? No, Your Honor. I take that to be a reference to his April 4, 2004 complaint to the Affirmative Action Office. Except that's separate. That comes later at lines 26 and 27. He's doing these in chronological order. He's got, well, not entirely chronological order, but then he's got September 2002, May 13, 2003, December 2003, then this undated one that I read to you, then 2004, then April 2004. I see that, Your Honor. And my explanation for that is I think it was tied to the April 4, 2004 complaint because it was the same complaint he made at the time. I don't think you can complain that it wasn't adequately pled as a basis for saying that it shouldn't have been considered by the district court when it was specifically then raised later, can you? Well, under the decisions in 389 Orange Street Partners and the Pickern case, if a claim is first brought in the opposition to motion for summary judgment, the district court isn't required to consider it. But I think that the ‑‑ I'm sorry. No, no, go ahead. Okay. I think that the overriding answer to the entire question is that there was a legitimate nondiscriminatory reason for changing the security duties. And when that was done, it did not impact his pay or his number of hours, and we believe that the district court's decision should be affirmed. Thank you. Thank you, counsel. The case just heard will be submitted, and we'll proceed to the next case on the oral argument calendar, which is Yates v. Gunn, Allen Financial. Cases of Copeland v. Frederick and Inman v. Glimp are submitted on the briefs. Thank you.
judges: Wallace, Thomas, Graber